UNITED STATES, Appellee,

v.

Staff Sergeant Harvey A. GARDINIER
II, United States Army, Appellant.

ARMY 20020427.

U.S. Army Court of Criminal Appeals.

31 March 2006.

For Appellant: Captain Seth A. Director, JA (argued); Colonel Robert D. Teetsel, JA; Lieutenant Colonel Mark Tellitocci, JA; Major Sean S. Park, JA; Captain Lonnie J. McAllister II, JA (on brief); Colonel John T. Phelps II, JA; Lieutenant Colonel Kirsten V.C. Brunson, JA; Major Charles A. Kuhfahl, Jr., JA (on specified issue brief); Captain Jeremy W. Robinson, JA.

For Appellee: Captain Robert C. Stelle, JA (argued); Colonel Steven T. Salata, JA; Lieutenant Colonel Theresa A. Gallagher, JA; Captain Edward E. Wiggers, JA; Captain Michael D. Wallace, JA (on brief); Colonel Steven T. Salata, JA; Captain Michael D. Wallace, JA (on specified issue brief).

Before MERCK, SCHENCK, and WALBURN, Appellate Military Judges.

OPINION OF THE COURT

SCHENCK, Senior Judge:

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of indecent acts with a child under sixteen years of age and indecent liberties with a child under sixteen years of age, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934 [hereinafter UCMJ]. The convening authority approved the adjudged sentence to a bad-conduct discharge, confinement for three years, and reduction to Private E1. This case is before the court for review under Article 66, UCMJ, 10 U.S.C. § 866.

In their original pleadings, appellate defense counsel asserted, *inter alia,* the military judge erred by finding the victim unavailable to testify under Military Rule of Evidence [hereinafter Mil. R. Evid.] 804 in violation of appellant's Sixth Amendment right to confrontation. We then specified the following issues: (1) whether, in light of the Supreme Court's decision in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), appellant was denied his Sixth Amendment right to confront a witness against him where the military judge ruled that Ms. KG was unavailable to testify against him at his trial by court-martial; (2) assuming, *arguendo,* that the military judge erred in admitting the videotaped interview of Ms. KG, whether the error was harmless; and (3) whether, in light of *Crawford,* the videotaped interview of Ms. KG constitutes testimonial hearsay requiring that the declarant be subject to cross-examination as required by the Sixth Amendment to the United States Constitution.

We agree with appellate defense counsel that the military judge erred in his finding of unavailability and, therefore, need not determine whether the videotaped interview of KG should be considered testimonial under *Crawford.* Nevertheless, we find the military judge's error was harmless beyond a reasonable doubt and affirm the findings of guilty and the sentence.

## FACTS

The military judge found appellant guilty of committing an indecent act upon KG (ap-pellant's five-year-old biological daughter) by placing his hands on her vagina with intent to gratify his sexual desires between on or about September 1999 and December 1999 (Specification 4 of the Charge). He also found appellant guilty of taking indecent liberties with KG by exposing himself, having her touch his penis, then shaking his own penis until he ejaculated, with intent to gratify his sexual desires, on or about 29 December 2001 (Specification 1 of the Charge). The military judge found appellant not guilty of a second indecent acts specification (Specification 3 of the Charge) that alleged appellant touched KG's vagina on another occasion during the same period alleged in Specification 4. He also found appellant not guilty of a second indecent liberties specification (Specification 2 of the Charge) that alleged appellant exposed his penis and ejaculated in KG's presence between December 2000 and March 2001.

These offenses came to light when, on 29 December 2001, Mrs. Gardinier went to a friend's house and left her five-year-old daughter, KG, and one-year-old son with appellant, her husband. When Mrs. Gardinier returned home, KG excitedly ran up to her mother and told her appellant was "laying naked." Mrs. Gardinier then walked KG into KG's room and asked her if anybody had ever "touched her in her private part." In response, KG "opened her underwear to the side," showed her mother her "private areas," and said, "Daddy does." Mrs. Gardinier confronted appellant who denied the allegation and told her, "If you don't believe me, you can get the fuck out." KG then told her mother "Daddy's a liar." Mrs. Gardinier took KG back to Mrs. Gardinier's room, asked KG when her father inappropriately touched her, and KG said, "[E]very time [her mother] left" the house.

That same night, Mrs. Gardinier took KG to Evans Army Community Hospital at Fort Carson where a doctor gave KG a regular physical examination. Upon completion of the examination, Mrs. Gardinier spoke with a social worker, and with two El Paso County police officers who took her statement. Thereafter, the police escorted Mrs. Gardini-

er and KG home and removed appellant from the Gardinier household.

After the investigation began, KG attempted to talk to her mother about what Mrs. Gardinier referred to as "Dad's cooter," but Mrs. Gardinier changed the subject. Mrs. Gardinier also testified that after KG was interviewed regarding appellant's conduct, KG's behavior worsened. Specifically, KG became violent towards her mother and younger brother; KG also bit herself. At trial, Mrs. Gardinier denied KG was developmentally slow for a five-year-old child but said KG had never been tested.

Detective Larsen of the El Paso County Sheriff's Office and Ms. Cheney of the Colorado Department of Human Services interviewed KG at the Children's Advocacy Center in Colorado Springs on 2 January 2002. KG made several statements indicating appellant had sexually abused her. This interview was videotaped and admitted into evidence as Prosecution Exhibit 3 over defense objection. During the interview, KG told Detective Larsen that appellant "was naked and he was sitting on the couch," and he does "that all the time." KG also indicated appellant touched her in her groin area with his hand—by pointing there several times—after he helped her take a bath. When Detective Larsen asked KG whether appellant was wearing any clothes while bathing, she answered, "Nope." Furthermore, KG stated her father touched her in her groin area on other occasions, including when her mother was home. Ms. Cheney asked KG whether her father ever made her touch him, and KG responded affirmatively; however, she would not respond orally to the question, "Where do you have to touch him at?" After Detective Larsen drew a picture of a person and asked KG to show him where her father made her touch him, KG pointed to the groin area which she said looked like "pee." KG stated "[i]t gets bigger" when she touches her father's penis. KG also drew on Detective Larsen's picture her interpretation of "[i]t gets bigger." Detective Larsen then asked, "What happens after that?" Ms. Cheney interjected by asking, "What comes out of it?" KG's response was that "pee pee"

comes out of her father's penis after she touches it.

Ms. Sievers, a registered nurse, clinical forensic specialist, and sexual assault nurse examiner at the Children's Advocacy Center, testified at trial that she also interviewed KG on 2 January 2002. While she was taking KG's medical history, KG stated she saw appellant naked. KG also told Ms. Sievers that she wanted to tell her mother "that Daddy was naked and that she touched Daddy's cooter." KG spread her legs, pointed to her genital area, and stated that is where the "cooter" is located. KG told Ms. Sievers "her cooter was small, but sometimes she saw Daddy's cooter get bigger." Ms. Sievers completed a forensic medical examination form during the interview (admitted into evidence as Prosecution Exhibit 1) on which she annotated that KG "appears small for [her] age and delayed from a developmental perspective." In addition to the information provided during her testimony, Ms. Sievers' notes on the form indicate that when KG was asked why she came to see Ms. Sievers, KG replied, "Daddy was naked. I was going to tell mom. He was in Mommy's room. I was touching his 'cooter' with my hand." Ms. Sievers also performed a sexual assault examination on KG's vaginal and anal areas and the "detailed genital assessment was negative. It was normal ... for her age."

Ms. Freeman, a family friend since 1999, testified on the merits that she moved in with the Gardiniers on 30 December 2001 when appellant moved out. Ms. Freeman said after she moved in, her daughter and KG were drawing pictures. When Ms. Freeman asked what the pictures depicted, KG told her one represented "daddy's pee pee," and another picture was "daddy laying on the bed naked. Mom wearing underwear." The military judge stated he would only consider this information to reflect "things ... a 5–year-old female would not ordinarily have knowledge of," not for the truth of the matter asserted, and therefore, not as hearsay. Ms. Freeman also testified that KG was much more aggressive after the 29 December 2001 incident.

On 3 January 2002, Detective Larsen advised appellant of his *Miranda*[1] rights, which appellant waived. Detective Larsen then conducted a videotaped interview of appellant. Criminal Investigation Command (CID) Special Agent (SA) Phillips was present while Detective Larsen interviewed appellant.[2]

Immediately following the interview with Detective Larsen, SA Phillips conducted a videotaped interview of appellant that is consistent with appellant's two subsequently written statements. Afterward, appellant rendered a handwritten statement (Prosecution Exhibit 5) which reads:

On two separate occasions sometime after Sept. 99 when we moved here [KG] has taken a shower with me. She would walk in after I was already in there so after I got done washing, I would wash her up which included her groin area. Doing this unintentionally aroused me .... [A] year ago [KG] was in the bedroom watching cartoons, I was in the living room watching tv. I aroused myself and as I was finishing she came running in looking for chocolate milk and saw me.... Approx. 29 Dec. '01, I was changing into night clothes, [KG] came into [sic] watch cartoons in our bedroom, she saw me changing. In the course of trying to put my bottoms on, [my son] started crying. I ran out of the bedroom not yet fully dressed to see what happened. He just seemed to have toppled over.... [KG] came running out [and] noticed me still half-naked. She touched me which aroused me. My hand went to my penis which ejaculated a little which she noticed.

Appellant also provided a typed, sworn statement to SA Phillips on 7 January 2002 (Prosecution Exhibit 6). This second statement is generally consistent with the first, but adds further details. Appellant admits that when he showered with KG two times in September 1999, he was "somewhat aroused," and his penis was "halfway erect" after he touched KG's vaginal area, but "[i]t had nothing to do with her."

Appellant further states in the 7 January 2002 statement that between January and March 2001, "while my wife was pregnant[, KG] was in the bedroom watching cartoons, I was in the living room watching TV. I started to get aroused and quickly relieved myself. Just as I was finishing up, [KG] ran out of the bedroom and caught me. She pointed to me and commented that I was peeing." Appellant admits he was masturbating and ejaculated on himself and KG "probably did see [him] ejaculate" and she "probably" touched his penis.

In his 7 January statement, appellant also states that on 29 December 2001, KG came out of the tub with a towel and asked him to dry her off. He further indicates that on that night he ran out before he "got [his] pants fully on" to assist his son. Appellant states, "[KG] had come running out behind me and when I sat down she noticed my penis, her finger touched it as she commented on how I had a pee pee and [his son] had a pee pee.... It had gotten aroused and a drop of fluid was at the end of it." Appellant further states KG touched his penis for "1–2 seconds" and he became "sexually aroused;" he touched it, and "some semen came out and was on the tip of [his] penis."

The military judge denied appellant's motion to suppress the 3 January 2002 videotaped interview between Detective Larsen, SA Phillips, and appellant, appellant's 3 January 2002 handwritten statement, and appellant's 7 January 2002 written sworn statement to CID. He then considered these exhibits during trial on the merits.[3]

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. Detective Larsen testified SA Phillips was present during the interview. Our review of the videotaped interview indicates SA Phillips initially observed the interview from a separate room. Later in the videotaped interview Special Agent Phillips explains this to appellant.

3. We find appellant's assertions that: (1) his 3 January 2002 written statement provided to SA Phillips was involuntary (because SA Phillips did not inform appellant of his Article 31(b), UCMJ, 10 U.S.C. § 831(b), rights), and (2) his 7 January 2002 written statement to SA Phillips was "fruit of the poisonous tree," to be without merit. Initially, appellant was not specifically informed of his Article 31(b) rights. However, prior to taking the 3 January 2002 written statement, Detective

Prior to trial on the merits, the government moved *in limine*[4] to determine admissibility of the victim's 2 January 2002 videotaped statement based on Mil. R. Evid. 804(a)(6) (unavailability) and Mil. R. Evid. 807 (residual hearsay). Specifically, trial counsel made several assertions: because of KG's age, she was "simply unable to testify;" "because of her developmental ability, [she did not] understand and [could not] grasp the nature of the judicial proceedings, and therefore, could not testify truthfully in the judicial proceedings;" and due to the "gap of time," "she simply as a child [had] lost that information." Trial counsel further asserted KG could not "appreciate what happened; she [could not] give relevant and probative evidence because she [was] unwilling and unable to talk about it and because it [would] do her great harm to testify."

Trial defense counsel objected to admissibility of KG's videotaped statement based upon the Sixth Amendment Confrontation Clause. Trial defense counsel further argued that the victim had not yet refused to testify, and told the military judge, "The government, who has the burden, didn't call [KG].... They could have called her in a teleconference, or something to demonstrate simply the fact that she couldn't talk about it. Now, she did talk to defense counsel. It wasn't much. It was a statement, but it was certainly an accusatory statement, sir."

At trial, the military judge qualified Mr. Lehman, a Colorado licensed clinical social worker, as an expert in child development and the treatment of sexually abused children. He testified during the pretrial hearing—regarding the government motion *in limine* to have KG declared unavailable and her videotaped interview admitted—that KG

was having tantrums and was aggressive. Mr. Lehman said KG would not understand the judicial process or its seriousness, would be confused sitting in court in front of her father, and would be victimized again. However, he indicated that taking her testimony through closed-circuit television, though not beneficial or helpful to KG, would not be detrimental in the long run. Mr. Lehman said KG would probably refuse to talk, would have lost knowledge, or would be untruthful in front of her father. He stated KG was cognitively three or four years old, not her biological age of five.

Mr. Lehman testified on the merits that during one of his sessions with KG, she told him "about her father making her touch her cooter," and that "Daddy made her touch his cooter." He also noted Mrs. Gardinier's concern that KG's behavior had gotten progressively worse after the incident on 29 December 2001, and KG became more aggressive. Mr. Lehman restated his opinion from the motion hearing that, if she testified, KG would not benefit from being questioned by "individuals who aren't trained as licensed psychologists or treatment providers," in a "nontherapeutic environment," concerning what her father did to her; KG would be retraumatized to a certain degree depending upon the questions asked. Mr. Lehman also stated he did not necessarily agree that closed-circuit television testimony would not be harmful, but it would be "the lesser of two evils" considering the other option would be live, in-court testimony in front of appellant.

The military judge asked trial counsel to show cause why the government should deprive appellant of his right to confront the victim-witness without at least trying to arrange for a method of testimony not harmful

Larsen informed appellant he was being questioned because his daughter had made allegations of sexual misconduct, and further notified appellant of his *Miranda* rights. *See, Miranda,* 384 U.S. at 436, 86 S.Ct. 1602. The rights warnings and notice regarding the nature of the accusations Detective Larsen gave appellant satisfy the requirements of Article 31(b), UCMJ, and *Miranda. See, United States v. Seay,* 60 M.J. 73, 77 (C.A.A.F.2004) (reaffirming the applicability of *Miranda* to military law as stated in *United States v. Tempia,* 16 U.S.C.M.A. 629, 640, 37 C.M.R. 249, 260, 1967 WL 4235 (1967)). Furthermore, prior to rendering his 7 January 2002

statement, SA Phillips specifically advised appellant of his Article 31(b), UCMJ, rights, which appellant waived.

4. "A motion *in limine* normally has the purpose of preventing the introduction of an adversary's evidence. *See United States v. Gamble,* 27 M.J. 298, 306 (C.M.A.1988). In this case, the Government, rather than offering the statement, sought a pretrial ruling as to admissibility." *United States v. Giambra,* 33 M.J. 331, 333 n. 3 (C.M.A. 1991).

to the child. The military judge suggested trial counsel "at least find out whether [KG is going] to be able to testify," i.e., by interviewing KG in court, before denying appellant his right to confrontation. He then told the government to prepare the courtroom for KG to testify using closed-circuit television. The military judge wanted "to make absolutely sure that everybody else is correct, that we'll not get anything out of [KG]." He also informed appellant that, in the alternative, he could voluntarily absent himself from the courtroom while KG testified on the stand.

During Mrs. Gardinier's testimony, the military judge told her, "[E]vidence in a criminal case ought to be brought out in court. So, I've determined that I'd like to hear [KG] testify, if she can testify, by closed-circuit television.... I know that's against your wishes. And I will not force her to testify if you say that you don't want me to have her testify. I shouldn't say 'force her to testify.' I won't have her called if you don't approve of that." Mrs. Gardinier responded, "I don't want her to." The military judge further asked, "Are you saying you'll not allow her to testify?" Mrs. Gardinier responded, "Yes."

After the witness was excused, the military judge stated, "I'm going to have to think about that for awhile. I don't think it's right that I order [KG] to testify or to appear to try to testify over the objections of her mother. Obviously, [KG] is Ms. Gardinier's child, not mine. So, I need to consider the implications of that now." Subsequently, the military judge stated, "Make sure I have this issue framed correctly in my mind. I've decided, I guess as a matter of personal conscience, that I am not going to require [KG] to testify by closed-circuit TV over ... her mother's objection."

Later, when announcing his findings with regard to the motion *in limine*, the military judge stated:

MJ: Okay. I have determined that [KG] is unavailable to testify.

I watched the videotape interview of her again last evening. It's apparent to me that [KG] was even then reluctant to talk about these charged events.

Mrs. Gardinier says that she has been unable to get [KG] to talk about the events, although based upon her testimony, I don't believe that Mrs. Gardinier has pushed [KG] to discuss it with her.

Mr. Lehman has had six therapy sessions with [KG], each between 40 and 60 minutes long, and in those 5 or 6 hours of sessions, [KG] has made only one brief mention of what happened, despite Mr. Lehman's attempts to get her to discuss this as part of her therapy. Mr. Lehman's expert opinion is that [KG] will not provide any useful information if called because of her reticence and because the passage of time has dimmed her recall of events. Mr. Lehman talked to [KG] just days ago when she returned to Colorado, and he got nothing from her concerning the events. If she won't relate the event to him, someone she's familiar with, there's no reason to believe that she will relate events to strangers in a judicial setting.

Counsel for both sides have attempted to discuss this with [KG] in preparation for trial without success. I think I have the trial counsel's representation that the defense has been unable to get her to relate anything. I don't believe I've heard that directly from the defense counsel.

I find that giving the defense an opportunity to cross-examine [KG] would not be productive or helpful. There are, of course, many other ways of attacking a [witness'] credibility other than through cross-examination.

It had been my intent yesterday, of course, to attempt to get her to testify by closed-circuit television, but that was just a hope and a prayer that she would in fact cooperate, and I find that she would not. And in view of Mrs. Gardinier's objection to that attempt and because I'm convinced it would not be productive, I decided not to order that.

The military judge then made findings fulfilling the requirements of Mil. R. Evid. 807 (residual hearsay) and regarding the trustworthiness of the statements in accordance with *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct.

3139, 111 L.Ed.2d 638 (1990),[5] and admitted KG's videotaped statement. The following colloquy then transpired:

> ADC: Sir, just to clarify the record, during my conversation with [KG], I did ask her what happened, and she said, "Daddy had showed me his cooter on the couch." When I asked her again, her response was no, that that didn't happen. [Trial counsel] was there during that question and during her response, as well.
>
> . . . .
>
> TC: Your Honor, just to elaborate on that. The statements made by defense counsel, of course, are true. Defense Counsel asked several questions about that, and [KG] several times said, "I'm done. I'm not talking about it," and [KG] changed the subject. [Assistant defense counsel (ADC)] continued to ask her questions, at which time [ADC] said, "Can you tell me what you told your mother?" and [KG] said, as defense counsel pointed out, "Daddy showed me his cooter. I'm done." And [KG] said, "I'm stopped talking. I'm done now. I'm done," and then [ADC] again said, "Can you tell me what you said?" and asked for more clarification questions, and [KG] refused to comply. She said "No. No." And I don't know if she meant no, it didn't happen, "No, I'm done talking," [or] "No, I won't talk about it." At that point, after several more minutes of that, [ADC] and I, I think, both decided that she would not be productive to talk to and she was not going to speak with us any longer.

The military judge then asked if trial counsel had interviewed KG without the defense present. Assistant trial counsel said she talked to KG without the defense two months prior to trial and KG "wouldn't give [her] any more information then." Assistant trial counsel told the military judge that when she interviewed KG "just . . . the other day," she asked KG if she remembered why she was going to testify. KG replied, "About my dad's cooter," but provided nothing further. When she asked KG if she would be able to come to the courtroom and tell the judge what happened, "her response was no."

The military judge then stated, "Okay. So, at the most, she's been able to—has been willing to repeat what she told her mother but without amplification. That doesn't change my determination that she's unavailable and that putting her on the stand would not be helpful." Trial defense counsel renewed his objection to admission of KG's 2 January 2002 videotaped statement based on Mil. R. Evid. 807 and the Sixth Amendment Confrontation Clause.

On the brink of entering findings on the merits, the military judge asked trial counsel to explain the apparent facial duplicity regarding Specifications 3 and 4 of the Charge. Both specifications allege appellant committed an "indecent act upon [KG]" by "placing his hands on her vagina;" both specifications allege the same dates, i.e., between on or about September and December 1999. Trial counsel responded that appellant's two written statements and his videotaped admissions essentially state, "Back in the fall or back in September through December of '99, on two separate occasions I showered with my daughter." After deliberating, the military judge announced his findings, and explained why he found appellant not guilty of Specification 3 of the Charge, but guilty of Specification 4 of the Charge. The military judge could not find beyond a reasonable doubt that appellant had the requisite intent concurrent with the committed act set forth in Specification 3 of the Charge. However, as for Specification 4 of the Charge, the military judge stated appellant "was on notice of his proclivities; and allowing it to happen again as charged in Specification 4, I found beyond a reasonable doubt that the requisite intent was concurrent with the acts charged."

## CONFRONTATION CLAUSE

### Law

*Admissibility of Evidence*

*Standard of Review*

We review a military judge's ruling on the admissibility of evidence for an abuse of dis-

---

**5.** *See* note 11, *infra,* describing the requirements that must be met under Mil. R. Evid. 807 and

*Wright.*

cretion. *United States v. Datz,* 61 M.J. 37, 42 (C.A.A.F.2005); *United States v. Gilbride,* 56 M.J. 428, 430 (C.A.A.F.2002) (citing *United States v. Ayala,* 43 M.J. 296, 298 (C.A.A.F. 1995)); *see, e.g., United States v. Johnston,* 41 M.J. 13, 16 (C.M.A.1994) (admissibility of scientific evidence); *United States v. Gray,* 40 M.J. 77, 80 (C.M.A.1994) (admissibility of evidence of witness bias); *United States v. Mukes,* 18 M.J. 358, 359 (C.M.A.1984) (admissibility of uncharged misconduct evidence); *see generally* S. Childress & M. Davis, 2 Federal Standards of Review § 11.02 (2d ed.1992) (evidentiary rulings reviewed for abuse of discretion). When performing such a review, our court examines a military judge's findings of fact using a clearly-erroneous standard and conclusions of law de novo. *United States v. Rodriguez,* 60 M.J. 239, 246 (C.A.A.F.2004).

■ Where the erroneous admission of hearsay[6] evidence deprives an accused of his Sixth Amendment right to confrontation, i.e., cross-examination, the error rises to the level of Constitutional error. *See United States v. Hall,* 58 M.J. 90, 94 (C.A.A.F.2003) (finding Constitutional error where appellant was "denied her [C]onstitutional right of confrontation through cross-examination" of hearsay declarant); *United States v. Hughes,* 48 M.J. 700, 710 (A.F.Ct.Crim.App.1998) (stating "[e]vidence which is erroneously admitted under the residual hearsay exception, because of Sixth Amendment ties, is error of [C]onstitutional dimension"), *aff'd,* 52 M.J. 278 (C.A.A.F.2000).

Moreover, erroneously admitted residual hearsay that constitutes an "error of [C]onstitutional dimension"—because of its "Sixth Amendment ties"—requires reversal unless we determine the evidence "to be harmless beyond a reasonable doubt." *Hughes,* 48 M.J. at 710 (citing *United States v. Alba,* 15 M.J. 573, 576 (A.C.M.R.1983)); *see Chapman*

*v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (holding that before a Constitutional error can be held harmless, an appellate court must find the error was "harmless beyond a reasonable doubt"). We review "de novo" whether the "[C]onstitutional error was harmless beyond a reasonable doubt." *United States v. Kreutzer,* 61 M.J. 293, 299 (C.A.A.F.2005); *see Arizona v. Fulminante,* 499 U.S. 279, 295, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *United States v. Hall,* 56 M.J. 432, 436 (C.A.A.F.2002); *United States v. Grijalva,* 55 M.J. 223, 228 (C.A.A.F.2001); *United States v. George,* 52 M.J. 259, 261–62 (C.A.A.F.2000). "The inquiry for determining whether [C]onstitutional error is harmless beyond a reasonable doubt is 'whether, beyond a reasonable doubt, the error did not contribute to the defendant's conviction or sentence.'" *Kreutzer,* 61 M.J. at 298 (quoting *United States v. Kaiser,* 58 M.J. 146, 149 (C.A.A.F.2003), quoting *United States v. Davis,* 26 M.J. 445, 449 n. 4 (C.M.A. 1988)).

### Constitutional Right to Confrontation— Before Crawford

The Confrontation Clause of the Sixth Amendment to the U.S. Constitution requires that, "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. While a literal reading of the Confrontation Clause would operate to bar the admission of *any* out-of-court statements made by declarants not present to testify at trial, *see Ohio v. Roberts,* 448 U.S. 56, 63, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Supreme Court rejected such a strict interpretation as "'unintended and too extreme.'" *Wright,* 497 U.S. at 814, 110 S.Ct. 3139 (quoting *Bourjaily v. United States,* 483 U.S. 171, 182, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)). The Court has "consistently held that the Clause does not necessarily prohibit the admission of hearsay

---

6. Hearsay is defined as an out-of-court statement being offered into evidence to prove the truth of matter asserted in the statement. Mil. R. Evid. 801(c). Hearsay is generally not admissible at trial unless it falls under one of the enumerated exceptions to the rule against its admission or some other applicable evidentiary rule. *See* Mil. R. Evid. 802–805. Where hearsay does not fall under one of the enumerated exceptions or other

evidentiary rule, the proponent of the hearsay statement may move for its admission under the "residual exception." Mil. R. Evid. 807. The residual exception allows admission of "statement[s] not specifically covered by [Mil. R. Evid.] 803 or 804 but having equivalent circumstantial guarantees of trustworthiness." Mil. R. Evid. 807.

statements ... even though the[ir] admission ... might be thought to violate the literal terms of the Clause." *Id.* at 813, 110 S.Ct. 3139 (citing *Mattox v. United States,* 156 U.S. 237, 243, 15 S.Ct. 337, 39 L.Ed. 409 (1895)). Moreover, "[a]lthough the right of confrontation and the hearsay rule stem from the same roots, they are not coextensive, and evidence admissible under a hearsay exception may still be inadmissible under the Confrontation Clause." *United States v. Palacios,* 32 M.J. 1047, 1051 n. 5 (A.C.M.R.1991), *rev'd,* 37 M.J. 366, 367–68 (C.M.A.1993) (upholding lower court's finding that admission of child-victim's videotaped statement was erroneous, but finding admission not harmless beyond a reasonable doubt); *see California v. Green,* 399 U.S. 149, 155–56, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). The Confrontation Clause calls for the declarant to be physically present in the courtroom; physical presence allows the accused to confront the declarant in person, and cross-examine him in front of the trier of fact. *See Roberts,* 448 U.S. at 65, 100 S.Ct. 2531; *Palacios,* 32 M.J. at 1049–50. However, the admission of hearsay evidence, in the absence of the declarant, does not always violate the Confrontation Clause.

In *Ohio v. Roberts,* the Supreme Court set out a general framework for determining whether admission of an out-of-court hearsay statement violates an accused's Sixth Amendment right to confrontation.

> [W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Roberts,* 448 U.S. at 66, 100 S.Ct. 2531.

Essentially, the Court in *Roberts* held, "[H]earsay is admissible when the witness is unavailable and the hearsay either 'falls within a firmly rooted hearsay exception,' *see, e.g., White v. Illinois,* [502 U.S. 346, 355, 112 S.Ct. 736 (1992)], or has 'particularized guarantees of trustworthiness,' *see, e.g., [Wright,* 497 U.S. at 820, 110 S.Ct. 3139]." *United States v. Bridges,* 55 M.J. 60, 62–63 (C.A.A.F. 2001) (citing *Roberts,* 448 U.S. at 66, 100 S.Ct. 2531). Furthermore, while firmly rooted hearsay exceptions will generally stand on their own inferred reliability, "the residual hearsay exception[, Mil. R. Evid. 807,] is not firmly rooted—thus, the requirement to establish unavailability and particularized guarantees of trustworthiness." *Id.* at 63, 100 S.Ct. 2531; *see Wright,* 497 U.S. at 817, 110 S.Ct. 3139 ("Idaho's residual hearsay exception ... is not a firmly rooted hearsay exception.") (internal citation omitted).

### Constitutional Right to Confrontation— After Crawford

In 2004, the Supreme Court's decision in *Crawford,* 541 U.S. at 36, 124 S.Ct. 1354, partially overruled the well-established unavailability and trustworthiness framework enunciated in *Roberts.* The *Crawford* decision now requires a determination regarding whether out-of-court statements are "testimonial" or "nontestimonial" in nature. *Crawford,* 541 U.S. at 67–68, 124 S.Ct. 1354.

In light of *Crawford,* "testimonial" hearsay is inadmissible at trial unless the declarant is *unavailable* and the defense was afforded a *prior opportunity to cross-examine* the declarant. *Id.* at 68, 124 S.Ct. 1354. Decisions regarding admissibility of "nontestimonial" hearsay continue to involve fulfilling the requirements set forth in *Roberts— unavailability* of the declarant and, in the case of residual hearsay, *particularized guarantees of trustworthiness. Id.; Horton v. Allen,* 370 F.3d 75, 83–84 (1st Cir.2004) (When "nontestimonial hearsay is at issue" the *Crawford* framework "is inapplicable and *Roberts* continues to apply."), *cert. denied,* 543 U.S. 1093, 125 S.Ct. 971, 160 L.Ed.2d 905 (2005).

### Unavailability of the Witness

Therefore, despite *Crawford's* mandate to determine whether a statement is "testimonial" or "nontestimonial" in nature, trial judges must first analyze and find the declarant physically and legally *unavailable,*

unless the out-of-court statement is nontestimonial and falls within a firmly rooted hearsay exception.[7] Notwithstanding *Crawford's* testimonial-nontestimonial distinction, if the government cannot produce the declarant, his *physical unavailability* must be satisfactorily established at trial. *Roberts,* 448 U.S. at 66, 100 S.Ct. 2531. However, even if the declarant is present at trial, the military judge may find him *legally unavailable* if, for instance, he asserts a privilege exempting him from testifying, claims loss of memory, or refuses to answer questions. *See* Mil. R. Evid. 804(a); *Green,* 399 U.S. at 167–68, 90 S.Ct. 1930.

Residual hearsay under Mil. R. Evid. 807 is permissible,

> provided the Government adequately demonstrates the declarant's unavailab[ility] as a witness. *See* Mil. R. Evid. 804(a). In determining unavailability, [t]he ultimate question is whether the witness is unavailable despite goodfaith efforts undertaken prior to trial to locate and present that witness. Nonetheless, *if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith may demand their effectuation.* The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness.

*United States v. Ferdinand,* 29 M.J. 164, 166 (C.M.A.1989) (alterations in original) (internal citations and quotation marks omitted), *cert. denied,* 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990). Therefore, "to be admissible, residual hearsay statements have to pass both [C]onstitutional and evidentiary muster," including the satisfactory showing of physical and legal unavailability. *Palacios,* 32 M.J. at 1051.

Prior to admitting residual hearsay under Mil. R. Evid. 807 (which is not a firmly rooted hearsay exception and not admissible under Mil. R. Evid. 803), the government must establish the declarant of the prior, out-of-court statement is legally unavailable pursuant to Mil. R. Evid. 804(a). *See White,* 502

U.S. at 355, 112 S.Ct. 736; *Bridges,* 55 M.J. at 63; *United States v. Lyons,* 36 M.J. 183, 186 n. 2 (C.M.A.1992); *United States v. Clark,* 35 M.J. 98, 105 (C.M.A.1992); *Palacios,* 32 M.J. at 1051 n. 6. Military Rule of Evidence 804(a) provided the military judge in appellant's case three potentially applicable options for finding the child-victim legally unavailable. Specifically, Mil. R. Evid. 804(a) provides:

> "Unavailability as a witness" includes situations in which the declarant—
>
> . . . .
>
> (2) persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the military judge to do so; or
>
> (3) testifies to a lack of memory of the subject matter of the declarant's statement; or
>
> . . . .
>
> (6) is unavailable within the meaning of Article 49(d)(2)[, an article entitled "Depositions"].

Article 49(d)(2), UCMJ, 10 U.S.C. § 849(d)(2), further states that a witness is unavailable if the witness, "by reason of death, age, sickness, bodily infirmity, imprisonment, military necessity, nonamenability to process, or other reasonable cause, is unable or refuses to appear and testify in person at the place of trial or hearing."

### Discussion

■ We find the military judge made an insufficient attempt to obtain KG's testimony. Furthermore, he abused his discretion in finding KG legally unavailable within the meaning of Mil. R. Evid. 804(a). Therefore, we need not enter the morass of case law interpreting the distinction between "testimonial" and "nontestimonial" hearsay statements set forth by the *Crawford* Court, and we will "leave for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Crawford,* 541 U.S. at 68, 124 S.Ct. 1354.[8]

---

7. Nontestimonial hearsay statements that fall under a firmly rooted hearsay exception do not require a finding of legal unavailability prior to

their admission. *See* Mil. R. Evid. 803 (*availability of declarant immaterial*).

8. Varying judicial interpretations are reflected in case law applying *Crawford* in determining

Obtaining KG's physical presence at trial or determining her whereabouts was never an issue; the record seems to indicate trial counsel could locate her, and she was available when the government was preparing the court for closed-circuit testimony. The military judge at one point decided to require KG to testify via closed-circuit television. He also properly gave appellant the option to absent himself from the courtroom instead of having the child-victim testify via closed-circuit television.[9] However, the military judge subsequently declined to order KG to testify by closed-circuit television "over ... her mother's objection" and "as a matter of personal conscience."

The military judge appeared to fulfill physical unavailability using the standard for legal unavailability. While in some cases this may be accomplished, in appellant's case, the record is unclear upon which Mil. R. Evid. 804(a) provision the military judge based his finding of unavailability. Nevertheless, the government's stated basis for KG's unavailability was Mil. R. Evid. 804(a)(6). Specifically, trial counsel asserted that due to KG's

age: "she's *simply unable* to testify;" *did not understand* the nature of the proceedings (due to developmental delay), and therefore, could not be truthful;[10] had *"lost* th[e] *information"* in her original disclosure regarding appellant's acts, and "couldn't give that information on the stand even if she wanted to;" and, *could not "give relevant and probative evidence"* because she was *"unwilling and unable to talk"* about the offenses and because testifying would cause her *"great harm."*

The military judge's additional comments and findings reflect that he found KG unavailable because: (1) her mother asserted KG was reluctant to talk; (2) KG would not provide useful information because she had not revealed any new information to Mr. Lehman (her counselor) or assistant trial counsel, and KG would "repeat what she told her mother but without amplification;" (3) "cross-examin[ing KG] would not be productive or helpful;" and, (4) her mother "object[ed]" to KG testifying by closed-circuit television.

whether child sexual abuse victims' videotaped (or oral) statements are "testimonial" or "nontestimonial" in nature. For instance, the Eighth Circuit Court of Appeals and appellate courts in Maryland, Oregon, and California have held that child-victims' statements made to social workers or similar professionals, with some level of law enforcement participation, are testimonial. *See, e.g., United States v. Bordeaux*, 400 F.3d 548 (8th Cir.2005), *reh'g en banc denied*, 2005 U.S.App. LEXIS 9866 (8th Cir. 27 May 2005); *State v. Snowden*, 385 Md. 64, 867 A.2d 314 (2005); *State v. Mack*, 337 Or. 586, 101 P.3d 349 (2004); *People v. Warner*, 14 Cal.Rptr.3d 419 (Cal.Ct.App. 3d Dist.2004), *rev. granted on other grounds*, 18 Cal.Rptr.3d 869, 97 P.3d 811 (Cal.2004). However, appellate courts in Minnesota, California, and Michigan have held that such statements made under similar circumstances, despite government participation and without any view toward prosecution, are nontestimonial. *See, e.g., State v. Bobadilla*, 709 N.W.2d 243 (Minn.2006); *People v. Cage*, 15 Cal.Rptr.3d 846 (Cal.Ct.App. 4th Dist.2004), *rev. granted*, 19 Cal.Rptr.3d 824, 99 P.3d 2 (Cal.2004); *People v. Geno*, 261 Mich. App. 624, 683 N.W.2d 687 (2004), *rev. denied*, 471 Mich. 921, 688 N.W.2d 829 (2004).

9. A military judge may allow a child witness to provide remote live testimony pursuant to Mil. R. Evid. 611(d)(1), which states, "In a case involving abuse of a child or domestic violence, the military judge shall ... allow a child victim or witness to testify from an area outside the court-

room as prescribed in [Rule for Courts–Martial [hereinafter R.C.M.]] 914A." However, Mil. R. Evid. 611(d)(4) does not permit remote live testimony if an accused first elects to leave the courtroom pursuant to R.C.M. 804(c). In any case, before using remote live testimony, a military judge must make a finding that a child is unable to testify in the presence of the accused because the child is afraid, would suffer emotional trauma from testifying, is mentally or otherwise infirm, or the parties' actions in court render the child unable to continue testifying. *See* Mil. R. Evid. 611(d)(3)(A)-(D).

10. A child-witness' ability to be truthful does not impact their competence to testify. Pursuant to Mil. R. Evid. 601, "[e]very person is competent to be a witness." Military Rule of Evidence 603 further provides that prior to testifying, a witness must "declare that [he or she] will testify truthfully, by oath or affirmation ...." This, however, does not mean children "might be incompetent to testify based on some general inability to understand an oath or affirmation to tell the truth." *United States v. Morgan*, 31 M.J. 43, 47 (C.M.A. 1990) (internal footnote omitted); *see also United States v. LeMere*, 16 M.J. 682, 685–86 (A.C.M.R. 1983) (finding three-year-old victim witness competent to testify and matters affecting her credibility properly left for panel members to decide), *aff'd*, 22 M.J. 61 (C.M.A.1986).

The record does not support a finding of unavailability based on 804(a)(6) (as trial counsel requested) as set forth in Article 49(d)(2), UCMJ, that due to KG's "age" she was unable or refused to appear and testify. Although Mr. Lehman's testimony and Ms. Sievers' annotations on the forensic medical examination form support an assertion that KG may have been developmentally slow, no evidence exists that KG "was unable" to appear and testify. In fact, KG told assistant defense counsel, "Daddy had showed me his cooter on the couch." Assistant trial counsel told the military judge, "I just interviewed [KG] the other day again" and she remembered why she was testifying; KG stated it was "[a]bout my dad's cooter." Although KG stopped and refused to elaborate during her discussions with counsel, this did not amount to a witness' inability or refusal to testify.

Additionally, as our superior court has noted:

> We are mindful, as are several state jurisdictions, that a child may be found to be unavailable to testify if a psychiatrist or psychologist has determined that participation in a trial would be too traumatic for the child. Nothing in the record indicates, however, that any determination of this sort was ever made.

*Ferdinand*, 29 M.J. at 167 (internal footnote omitted). Testimony from Mr. Lehman merely supports that discussing the offenses would not be beneficial or helpful to KG, e.g., she may experience some behavioral problems as a result. However, Mr. Lehman, the licensed clinical social worker, told the military judge, if KG testified via closed-circuit television, he did not "think in the long run it would be detrimental." As for Mrs. Gardinier's testimony, a "military judge is hardly bound to accept a mother's unprofessional, lay opinion that requiring a child to testify at trial would so traumatize the child as to outweigh an accused's right to confrontation." *Ferdinand*, 29 M.J. at 168. Nevertheless, the military judge did not include potential trauma to the victim as a basis for his finding of unavailability. *Cf. Contreras v. State*, 910 So.2d 901, 903, 907 (Fla.Dist.Ct. App.2005) (finding, despite psychologist's opinion that child-victim "would suffer severe 'emotional and psychological harm'" if she testified at trial, unavailability based upon "generalized harm" does not satisfy physical availability requirement of Confrontation Clause).

Although the government moved to find KG unavailable pursuant to Mil. R. Evid. 804(a)(6) due to her age, the military judge is not bound by counsel's assertions. As with objections, "[t]o require counsel for either side to identify all available [bases] in support of his or her [argument] is unnecessary in a context where the military judge is presumed to know the law and follow it." *Datz*, 61 M.J. at 42. Moreover, if the military judge made specific findings regarding unavailability—pursuant to other provisions within Mil. R. Evid. 804 (other than the provision on which the government requested a finding of unavailability), but his findings were still supported by the facts and law— we would uphold that decision. Therefore, we will analyze KG's unavailability based on other applicable provisions within Mil. R. Evid. 804 (i.e., Mil. R. Evid.804(a)(2) (persistent refusal to testify despite judge's order to testify) and Mil. R. Evid. 804(a)(3) (lack of memory of subject matter)).

Military Rule of Evidence 804(a)(2), authorizes a military judge to find a witness unavailable if a witness "persists in refusing to testify ... despite an order of the military judge to do so." We reiterate our sister court's position that a military judge must:

> attempt to persuade a recalcitrant witness to answer questions rather than assume an initial refusal is final. Although the judge may, in some circumstances, lack contempt power, a thorough explanation of the impact of refusal to testify on the parties to the trial and the exercise of all the moral persuasion available to the court should be attempted before a witness is declared unavailable.

*United States v. Hogan*, 16 M.J. 549, 550 (A.F.C.M.R.1983) (citing *United States v. Oliver*, 626 F.2d 254 (2d Cir.1980)), *rev'd on other grounds*, 20 M.J. 71 (C.M.A.1985) ("spill over" effect of Mil. R. Evid. 404(b) evidence). Furthermore, when dealing with a child witness, the more cautious approach would be to determine that the child "herself

refused to testify." *See Ferdinand,* 29 M.J. at 167 (stating that "[a]t a minimum, there was no determination that [the seven-year-old victim] herself refused to testify").

In appellant's case, after KG's mother stated she would not "allow" KG to testify, the military judge—without ordering KG to testify (as required by Mil. R. Evid. 804(a)(2))—"decided, ... as a matter of personal conscience," that he would not require KG to testify via closed-circuit television. While we agree that a mother's refusal to produce a child witness could be the basis for an unavailability determination under Mil. R. Evid. 804(a)(2), the military judge must fulfill the requirement of ordering her to produce the child prior to making that determination. "A military judge is hardly exercising his contempt powers under Article 48, UCMJ, 10 U.S.C. § 848, ... when he finds that any efforts to compel a mother to produce a child to testify would be 'futile' simply because she threatens to disobey his order before it is even issued." *Ferdinand,* 29 M.J. at 167.

Military Rule of Evidence 804(a)(3) allows the military judge to find a witness "functionally unavailable" when a child *testifies* that he does not remember. *United States v. Martindale,* 30 M.J. 172, 173 (C.M.A.1990). For example, the *Martindale* Court upheld the military judge's finding of unavailability when a twelve-year-old, emotionally and mentally disabled boy—the victim of a sex offense—was "functionally unavailable" based on his "claimed lack of memory and unwillingness to testify, as well as [the doctor's] testimony regarding the traumatic effect testifying would have on the child." *Id.* at 175. In appellant's case, KG never testified; others merely told the military judge she might not remember what her father did to her.

The military judge in appellant's case had potential options under Mil. R. Evid. 804(a) that he could have used to find KG unavail-

able. However, he abused his discretion when he found the child-victim unavailable because: her mother said KG was "reluctant to talk;" KG would not provide "useful information" and would "repeat what she told her mother;" "cross-examin[ing KG] would not be productive or helpful;" and her mother "objected" to KG testifying even by closed-circuit television. Furthermore, this court is unaware of any authority which permits a military judge to decline to order a witness to testify simply because he does not "think it's right" or "as a matter of personal conscience."

The military judge's determination that KG would not provide any "helpful" information alone does not provide a valid basis for a finding of unavailability. "[T]he Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *United States v. Owens,* 484 U.S. 554, 559, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988) (alteration in original) (quoting *Kentucky v. Stincer,* 482 U.S. 730, 739, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987), quoting *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985)); *see United States v. Rhodes,* 61 M.J. 445, 449–50 (C.A.A.F.2005) (citing *Owens,* 484 U.S. at 554, 108 S.Ct. 838) (finding admission of statement did not violate confrontation rights where special agent testified and was subject to cross-examination); *see also United States v. Moore,* 12 M.J. 854 (A.F.C.M.R.1981) (noting military judge has discretion over scope of cross-examination to impeach witness credibility based on raising matters concerning witness' mental or emotional problems).

Therefore, based on the facts of this case, we find the military judge erroneously determined KG was unavailable to testify at trial, and improperly admitted KG's videotaped statement.[11] In the future, we encour-

---

11. In light of our holding, we need not review the military judge's findings made in accordance with Mil. R. Evid. 807 and *Wright,* 497 U.S. at 820–22, 110 S.Ct. 3139. We note, however, that before residual hearsay may be admitted pursuant to Mil. R. Evid. 807, the following requirements must be met: declarant's unavailability, circumstantial guarantees of trustworthiness,

materiality, probative value, interests of justice, and notice to the adverse party. *See Bridges,* 55 M.J. at 63; *United States v. Sanchez–Lima,* 161 F.3d 545, 547–48 (9th Cir.1998); *United States v. Hsia,* 87 F.Supp.2d 10, 16 (D.D.C.2000); *Coyle v. Kristjan Palusalu Mar. Co.,* 83 F.Supp.2d 535, 545 (E.D.Pa.2000), *aff'd,* 254 F.3d 1077 (3rd Cir.2001). Additionally, in *Wright,* the Supreme

age military judges to include in the record of trial the Military Rules of Evidence, case law, and facts upon which they base their findings of physical and legal unavailability. Essentially, "a military judge is not merely a passive observer in determining a witness' unavailability." *Ferdinand,* 29 M.J. at 166–67.

## HARMLESS BEYOND A REASONABLE DOUBT

### Law

#### Standard of Review

Since we have determined the military judge abused his discretion by admitting KG's videotaped statement into evidence in violation of appellant's Sixth Amendment right to confrontation, we must now decide de novo whether that Constitutional error was "harmless beyond a reasonable doubt." *United States v. Simmons,* 59 M.J. 485, 489 (C.A.A.F.2004) (citing *Chapman,* 386 U.S. at 24, 87 S.Ct. 824).

#### Indecent Acts and Indecent Liberties

Article 134, UCMJ, provides that "all disorders and neglects [not specifically enumerated in the UCMJ,] to the prejudice of good order and discipline[, or tending] to bring discredit upon the armed forces, . . . of which persons subject to this chapter may be guilty, shall be taken cognizance of by . . . court-martial, . . . and shall be punished at the discretion of that court." The offenses of indecent acts and indecent liberties with children are included under Article 134, UCMJ. The offense of *indecent acts* (such as the allegation, in Specification 4 of the Charge, that appellant touched his daughter's vagina for sexual gratification between September 1999 and December 1999) contains the following elements:

(1) *Physical contact.*

Court emphasized that, when applying the *Roberts* standard to cases involving child witnesses, the circumstantial guarantees of trustworthiness "must likewise be drawn from the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief." *Wright,* 497 U.S. at 820, 110 S.Ct. 3139. The Court suggests an inexhaustive list of circumstances to consider, including:

(a) That the accused committed a certain act upon or with the body of a certain person;

(b) That the person was under 16 years of age and not the spouse of the accused;

(c) That the act of the accused was indecent;

(d) That the accused committed the act with intent to arouse, appeal to, or gratify the lust, passions, or sexual desires of the accused, the victim, or both; and

(e) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

*Manual for Courts–Martial, United States* (1998 ed.), Part IV, para. 87b(1).[12]

Furthermore, the offense of *indecent liberties* (such as the allegations, in Specification 1 of the Charge, that appellant, for sexual gratification, exposed himself, had his daughter touch his penis, and shook his penis until he ejaculated on 29 December 2001) contains the following elements:

(2) *No physical contact.*

(a) That the accused committed a certain act;

(b) That the act amounted to the taking of indecent liberties with a certain person;

(c) That the accused committed the act in the presence of this person;

(d) That this person was under 16 years of age and not the spouse of the accused;

(e) That the accused committed the act with the intent to arouse, appeal to, or gratify the lust, passions, or sexual desires of the accused, the victim, or both; and

(f) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

"spontaneity and consistent repetition" of the statements, "mental state of the declarant," the "use of [age-inappropriate] terminology," and "lack of motive to fabricate." *Id.* at 821–22, 110 S.Ct. 3139.

**12.** This provision remains unchanged in the 2000 edition of the *Manual.*

*Manual for Courts–Martial, United States* (2000 ed.), Part IV, para. 87b(2).

### Discussion

█ Considering all the evidence properly admitted at trial, we find the military judge's error in admitting KG's videotaped statement is harmless beyond a reasonable doubt. Appellant's statements (which are corroborated by the many admissible statements of the victim and other witnesses) describe several incidents of sexual contact with KG. The military judge only convicted appellant of two—specifically, committing an indecent act upon KG by placing his hands on her vagina with intent to gratify his sexual desires between on or about September 1999 and December 1999, and taking indecent liberties with KG by exposing himself, having her touch his penis, then shaking his own penis until he ejaculated, with intent to gratify his sexual desires, on or about 29 December 2001.

The few statements KG made during her videotaped interview add nothing new to the evidence properly admitted at trial. KG's interview, at best, offers cumulative evidence already elicited from other witnesses and documentary evidence. Therefore, we find that even when the five-year-old victim's videotaped statement is excluded from the evidence, the other properly-admitted evidence proves the offenses and appellant's guilt beyond a reasonable doubt.

Appellant's admissions and the additional evidence properly admitted at trial fully support appellant's conviction of the indecent acts offense. During his interview, appellant admitted to SA Phillips that when he bathed his daughter and touched his daughter's vagina, he got sexually aroused to the point that he got an erection. This, he asserts, occurred "a couple of times" or "about two times." Appellant told Detective Larsen, "If I thought of anything [while touching KG's vagina] . . . maybe I thought, 'Wow, my wife will be home soon, maybe we can go play,' " referring to being sexually intimate with Mrs. Gardinier. In his subsequent written statements, appellant admitted he twice showered with KG on or after September 1999, "unintentionally" became aroused, and his penis was "halfway erect" when he washed her "groin" or "vaginal" area. Mrs. Gardinier testified that after she returned home on 29 December 2001, KG came running up to her and told her mother "that her dad was laying naked." When she asked KG if anyone "touched her in her private part," KG "opened her underwear to the side," showed her mother her "private areas," and said, "Daddy does." Once appellant denied any inappropriate contact with his daughter, KG told her mother, "Daddy's a liar," and that her father touched her "every time [her mother] left" the house.[13]

---

13. The military judge admitted KG's statements to her mother as excited utterances—hearsay exceptions pursuant to Mil. R. Evid. 803(2) (excited utterance hearsay exception; *availability of declarant immaterial*). Military Rule of Evidence 803(2) permits the admission of an excited utterance "relating to a startling event or condition made while the declarant was under the stress of excitement cause[d] by the event or condition." The excited utterance exception is a "firmly rooted" exception to the hearsay rule. *See White*, 502 U.S. at 355 n. 8, 112 S.Ct. 736; *Mungo v. Duncan*, 393 F.3d 327, 331 (2nd Cir.2004). This means its reliability is inferred because it has been time-tested against "longstanding judicial and legislative experience." *Wright*, 497 U.S. at 817, 110 S.Ct. 3139 (citing *Roberts*, 448 U.S. at 66, 100 S.Ct. 2531). Furthermore, such statements are generally "nontestimonial" within the meaning of that term as described in *Crawford*. *See, e.g., United States v. Hadley*, 431 F.3d 484, 499–507 (6th Cir.2005) (domestic violence victim's spontaneously and excitedly made statements to police arriving at scene nontestimonial); *Compan v. People*, 121 P.3d 876, 880–81 (Colo. 2005) (abuse victim's statements to friend constituted excited utterances and nontestimonial); *Herrera–Vega v. State*, 888 So.2d 66, 69 (Fla.Dist. Ct.App.2004) (child's unrecorded, spontaneous statements to mother, later repeated to father, that she was sodomized nontestimonial), *rev. denied*, 902 So.2d 790 (Fla.2005). We agree with the military judge's findings regarding KG's statements to her mother, and do not find the military judge abused his discretion. *See United States v. Donaldson*, 58 M.J. 477, 484 (C.A.A.F. 2003) (noting presumption, generally, against admission of statements not immediately following startling event; however, cognizant of courts' flexibility "in cases in which the declarant is young, particularly where the statement was made during the child's first opportunity alone with a trusted adult") (citing *United States v. Jones*, 30 M.J. 127, 129 (C.M.A.1990) (noting child victims may stay excited longer than adults)); *United States v. Feltham*, 58 M.J. 470, 474–75 (C.A.A.F.2003); *United States v. Moolick*, 53 M.J. 174, 176 (C.A.A.F.2000); *United States v.*

Moreover, the additional evidence properly admitted at trial provides "independent evidence which establishes the trustworthiness of the confession." *United States v. Maio*, 34 M.J. 215, 218 (C.M.A.1992). The corroborating evidence raises "an inference of truth as to the essential facts admitted in the confession." *Id.* (internal quotations marks and footnote omitted); *see* Mil. R. Evid. 304(g)(1) ("*Quantum of evidence needed*.... The independent evidence need raise only an inference of the truth of the essential facts admitted."); *United States v. Arnold*, 61 M.J. 254, 257 (C.A.A.F.2005) (inference may come from "very slight" corroborating evidence); *Maio*, 34 M.J. at 218 n. 1 (quantum of corroborative evidence characterized as "slight" or "very slight").

As for the indecent liberties offense, appellant further describes an incident that occurred between January and March 2001. During his videotaped interview with SA Phillips, appellant admitted, "She has touched [my penis] ... on one other night[, other than on 29 December 2001] ... maybe a year or so ago." In his written statements, appellant asserts he was in his living room masturbating. He stated, "I aroused myself" and "ejaculated on me." KG saw appellant "as [he] was finishing," pointed to him, and commented that he was "peeing." Appellant admits KG "probably did see [him] ejaculate" and "probably" touched his penis. Despite

this incident with his five-year-old daughter earlier in 2001 of which appellant was found not guilty,[14] on 29 December 2001, when he had not finished putting on his pants and KG ran out and "noticed [him] still half-naked," appellant "sat down [and] she noticed [his] penis." KG "just reached out and touched it," and appellant became "sexually aroused after [KG] touched [his] penis." She touched his penis for "1–2 seconds." Appellant further states his "hand went to [his] penis which ejaculated a little which she noticed," and "some semen came out and was on the tip of [his] penis." When asked if he felt he had done anything wrong pertaining to the matters being investigated, appellant responded, "Yes, I got caught in situations like that. I didn't plan for it to happen that way."

These admissions are also fully corroborated by the evidence properly admitted at trial. Specifically, the victim told Ms. Sievers that she "touched daddy's cooter" and pointed to her genital area when referring to the cooter. KG also told Ms. Sievers "her cooter was small, but sometimes she saw daddy's cooter get bigger." Ms. Sievers' notes on the forensic medical examination form indicate KG told her, "Daddy was naked. I was going to tell mom. He was in Mommy's room. I was touching his 'cooter' with my hand." KG further told Mr. Lehman that "Daddy made [her] touch his cooter."[15] KG also told her

*Arnold*, 25 M.J. 129, 132 (C.M.A.1987) (sixteen-year-old rape victim's statement admissible despite approximate twelve-hour gap between rape and statement); *United States v. Farley*, 992 F.2d 1122, 1126 (10th Cir.1993) (five-year-old assault victim's statements admissible even though made two and twelve hours, respectively, after assault); *Gross v. Greer*, 773 F.2d 116, 119–20 (7th Cir. 1985) (four-year-old victim's statement, made twelve to fifteen hours after startling event, admissible); *United States v. Iron Shell*, 633 F.2d 77, 85 (8th Cir.1980) ("The lapse of time between the startling event and the out-of-court statement although relevant is not dispositive in the application of [Mil. R. Evid.] 803(2)."), *cert. denied*, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981); *United States v. Pearson*, 33 M.J. 913, 915 (A.F.C.M.R.1991) (noting child's excited utterance may come in response to questions from trusted adult, and "trustworthiness of the declaration is what is important"); *but see LeMere*, 22 M.J. at 68 (concluding "Mil.[ ]R.[ ]Evid. 803(2) cannot readily be applied to a situation where a child calmly answers questions asked by her

mother, instead of emotionally volunteering information").

**14.** In Specification 2 of the Charge, appellant was charged with "exposing his penis and ejaculating in [KG's] presence" between December 2000 and March 2001.

**15.** We also find the military judge properly admitted KG's statements to Ms. Sievers and Mr. Lehman. These statements are admissible as hearsay exceptions pursuant to Mil. R. Evid. 803(4) (statements for medical diagnosis and treatment hearsay exception; *availability of declarant immaterial*). Military Rule of Evidence 803(4) reads, "Statements made for purposes of medical diagnosis or treatment and describ[ing] medical history, or past or present symptoms, pain, or sensation, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." The medical diagnosis or treatment exception is also a "firmly rooted" exception to the hearsay rule. *See White*, 502 U.S. at 355 n.

mother "that her dad was laying naked;" her father "touched her in her private part;" and her father touched her "every time [her mother] left" the house. Ms. Freeman's testimony regarding the pictures the victim drew of her "daddy's pee pee," and depicting "daddy laying on the bed naked [and] [m]om wearing underwear," further provides evidence that KG had inappropriate sexual knowledge for a five-year-old child. Consequently, in this judge-alone court-martial, we are confident the erroneous admission of KG's videotaped interview was harmless beyond a reasonable doubt.

## Conclusion

We have considered appellant's other assignments of error, and those matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), in our review of the record and find them to be without merit. Accordingly, the findings of guilty and the sentence are affirmed.

Senior Judge MERCK * and Judge WALBURN concur.

---

8, 112 S.Ct. 736. This means its reliability, like that of the excited utterance, is also inferred because it also has been time-tested against "longstanding judicial and legislative experience." *Wright*, 497 U.S. at 817, 110 S.Ct. 3139 (citing *Roberts*, 448 U.S. at 66, 100 S.Ct. 2531). Furthermore, such statements are generally "nontestimonial" within the meaning of that term as described in *Crawford*. *See, e.g., United States v. Peneaux*, 432 F.3d 882 (8th Cir.2005) (statements made by child not a victim to the charged offense to a doctor for the purpose of ensuring his own health and protection, presumptively nontestimonial); *State v. Vaught*, 268 Neb. 316, 682 N.W.2d 284, 291–93 (2004) (child-victim's unrecorded statements to emergency room physician, identifying Vaught as perpetrator of sexual abuse, made for purposes of diagnosis or treatment and nontestimonial); *State v. Scacchetti*, 690 N.W.2d 393, 396 (Minn.Ct.App. 2005) (child-victim's videotaped statements to nurse practitioner nontestimonial because made for purposes of diagnosis and treatment, nurse not working on behalf of police to develop a case, and child victim or child of her age would not have reasonably believed statements would be available for use at later trial), *rev. granted*, 690 N.W.2d 393 (Minn.2005). We also note such statements can properly include identification of the perpetrator of the sexual abuse, i.e., "Dad" or "Daddy." *See, e.g., United States v. Deland*, 22 M.J. 70 (C.M.A.1986) (doctor's testimony concerning patient's identification of an offender admissible under Mil. R. Evid. 803(4) where close relative is alleged offender and identification reasonably pertinent to diagnosis or treatment); *Danaipour v. McLarey*, 386 F.3d 289, 297 (1st Cir.2004) ("Statements by young children amounting to disclosure to treating therapists that they have been abused by a member of their family are usually reasonably pertinent to treatment of the child."); *United States v. Yazzie*, 59 F.3d 807, 812 (9th Cir.1995) ("Sexual abuse involves more than physical injury; the physician must be attentive to treating the victim's emotional and psychological injuries, the exact nature and [extent] of which depend on the identity of the abuser.") (quoting *United States v. George*, 960 F.2d 97, 99 (9th Cir.1992)); *United States v. Renville*, 779 F.2d 430, 436–37 (8th Cir.1985) ("Statements by a child abuse victim to a physician during an examination that the abuser is a member of the victim's immediate household *are* reasonably pertinent to treatment" because "they are reasonably relied on by a physician in treatment or diagnosis.").

* Senior Judge Merck took action on this case prior to his retirement.