UNITED STATES, Appellee

v.

Harvey A. Gardinier II, Staff Sergeant
U.S. Army, Appellant

No. 06-0591

Crim. App. No. 20020427

United States Court of Appeals for the Armed Forces

Argued February 25, 2009

Decided April 28, 2009

ERDMANN, J., delivered the opinion of the court, in which
EFFRON, C.J., and BAKER, STUCKY, and RYAN, JJ., joined.

Counsel

For Appellant: Captain William J. Stephens (argued); Lieutenant
Colonel Matthew M. Miller, Lieutenant Colonel Mark Tellitocci,
Major Bradley M. Voorhees, and Major Grace M. Gallagher (on
brief); Lieutenant Colonel Jonathan F. Potter and Captain Teresa
L. Raymond.

For Appellee: Captain Philip M. Staten (argued); Colonel Denise
R. Lind and Lieutenant Colonel Mark H. Sydenham (on brief).

Military Judge: Gary V. Casida

**This opinion is subject to revision before final publication.**

United States v. Gardinier, No. 06-0591/AR

Judge ERDMANN delivered the opinion of the court.

This is the second time this case has been before this court. Staff Sergeant Harvey A. Gardinier II was convicted of one specification of indecent liberties with a child and one specification of committing an indecent act upon the same child, both in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2000).[1] In our first opinion we summarized the facts as follows:

> In December 2001, Gardinier's five-year-old daughter, KG, told her mother that Gardinier had touched her inappropriately. Her mother immediately took KG to Evans Army Community Hospital in Ft. Carson, Colorado, where a medical examination was conducted. The allegations were also reported to the El Paso County (Colorado) sheriff's office and the El Paso County Department of Human Services. On January 2, 2002, personnel from those agencies conducted a joint interview of KG, which was videotaped. That interview was immediately followed by a forensic medical examination by a sexual assault nurse examiner.

> On January 3, 2002, Gardinier was interviewed by a sheriff's department detective and then separately by an Army Criminal Investigation Division (CID) agent. The CID agent did not advise Gardinier of his rights under Article 31(b), UCMJ, 10 U.S.C. § 831(b) (2000). Both interviews were videotaped and Gardinier provided a written statement at the request of the CID agent. On January 7, the CID agent advised Gardinier of his Article 31, UCMJ, rights. Gardinier waived his rights and provided another statement.

> At trial the military judge admitted the videotape of the January 3 CID interview and both the January 3 and January 7 statements. He also admitted

---

[1] Gardinier was acquitted by the military judge of one specification of indecent liberties with a child and one specification of indecent acts with the same child.

United States v. Gardinier, No. 06-0591/AR

> the "Forensic Medical Examination" form completed by the sexual assault nurse examiner and allowed her to testify as to what KG told her during the examination. Further, the military judge determined that KG was not available to testify at trial and admitted the videotape of KG's interview with the El Paso law enforcement and human services officials. All of this evidence was admitted over defense objection.

United States v. Gardinier (Gardinier II), 65 M.J. 60, 61-62 (C.A.A.F. 2007).

In its initial review of the case, the United States Army Court of Criminal Appeals determined the military judge erred in finding that KG was unavailable to testify. United States v. Gardinier (Gardinier I), 63 M.J. 531, 540 (A. Ct. Crim. App. 2006). The videotape of her interview with civilian law enforcement was, therefore, erroneously admitted into evidence because it violated Gardinier's Sixth Amendment right to confront his accuser. Id. That court went on to find that the error was harmless beyond a reasonable doubt and affirmed the findings and sentence. Id. at 543.

In our 2007 decision we found that Gardinier's January 3, 2002, handwritten statement and the videotape of his interview that day were erroneously admitted because Gardinier had not been properly advised of his rights under Article 31(b), UCMJ. Gardinier II, 65 M.J. at 64. We also held KG's statements to the sexual assault nurse were erroneously admitted in violation of the Confrontation Clause of the Sixth Amendment. Id. at 66.

3

United States v. Gardinier, No. 06-0591/AR

We held that Gardinier's January 7, 2002, statement was properly admitted.  Id. at 64.

The effect of our decision and the initial decision of the Court of Criminal Appeals was that the following evidence had been admitted in error at Gardinier's trial:  (1) the January 2, 2002, videotape of KG's interview with civilian authorities; (2) Gardinier's January 3, 2002, handwritten statement; (3) the videotape of Gardinier's January 3, 2002, interview; and (4) the statements KG made to the sexual assault nurse.  Given the "changed evidentiary landscape," we remanded the case to the Court of Criminal Appeals to conduct a factual sufficiency review and also to consider whether the errors were harmless beyond a reasonable doubt.  Id. at 66-67.

On remand, the lower court held that the evidence was factually sufficient and the evidentiary errors were harmless beyond a reasonable doubt.  United States v. Gardinier (Gardinier III), No. ARMY 20020427, slip op. at 7 (A. Ct. Crim. App. Apr. 25, 2008).  We granted Gardinier's petition to determine whether the lower court was correct in holding that the evidentiary errors were harmless beyond a reasonable doubt. We hold that the errors were not harmless beyond a reasonable doubt and reverse the Court of Criminal Appeals.

United States v. Gardinier, No. 06-0591/AR

## Discussion

"For most constitutional errors at trial, we apply the harmless error test set forth in Chapman v. California, 386 U.S. 18 (1967), to determine whether the error is harmless beyond a reasonable doubt." United States v. Upham, 66 M.J. 83, 86 (C.A.A.F. 2008). Evidence admitted in violation of Article 31, UCMJ, or the Confrontation Clause of the Sixth Amendment is subject to that standard. See United States v. Brisbane, 63 M.J. 106, 116 (C.A.A.F. 2006); United States v. Crudup, 67 M.J. 92, 94 (C.A.A.F. 2008). "Whether a constitutional error in admitting evidence is harmless beyond a reasonable doubt is a question of law that we review de novo." Crudup, 67 M.J. at 94.

In assessing harmlessness in the constitutional context, the question is not whether the evidence is legally sufficient to uphold Gardinier's conviction without the erroneously admitted evidence. See Fahy v. Connecticut, 375 U.S. 85, 86 (1963). Rather, "'[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" Chapman, 386 U.S. at 23 (quoting Fahy, 375 U.S. at 86-87).

In United States v. Othuru, this court discussed what "contribute" to the conviction means:

> To say that an error did not "contribute" to the ensuing verdict is not, of course, to say that the jury was totally unaware of that feature of the trial later held to have been erroneous. . . .

5

United States v. Gardinier, No. 06-0591/AR

> To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.

65 M.J. 375, 377 (C.A.A.F. 2007) (quoting Yates v. Evatt, 500 U.S. 391, 403 (1991), overruled on other grounds by Estelle v. McGuire, 502 U.S. 62, 72 n.4 (1991)).

Additionally, in Confrontation Clause cases, this court frequently looks to the factors set forth in Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986), to assess whether an error is harmless beyond a reasonable doubt. See, e.g., Crudup, 67 M.J. at 94-95; Othuru, 65 M.J. at 378. The Van Arsdall Court stated:

> Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

Van Arsdall, 475 U.S. at 684 (citations omitted). We commence our analysis with a review of the erroneously admitted evidence:

Videotape of KG's January 2, 2002, Interview

The videotape of KG's January 2, 2002, interview with personnel from the department of human services and the sheriff's office contains a number of allegations supportive of the Government's case: KG responded affirmatively when asked if Gardinier touches children; she related that Gardinier touched

6

her crotch area with his hand after she had taken a bath and that he was naked during this incident; she acknowledged that Gardinier had touched her crotch area other times; when the interviewers ask if Gardinier ever makes KG touch him, KG responds affirmatively and says that "it's bigger" when she touches "it"; KG went on to say that "daddy was naked" and "[a] lot" of "pee" comes out of "it" after she touches "it."

When the military judge admitted the tape into evidence he stated he had watched the videotape more than once and the videotape was "direct evidence of the alleged acts" and "more probative than any other evidence."  The military judge went on to state that "the videotape allows the finder of fact to actually view directly [KG]'s demeanor and her statements unfiltered by any other person's perceptions or memory."  As the military judge was the finder of fact in this case, we need not speculate as to the importance of this evidence to the finder of fact.  The military judge considered KG's videotaped interview as "direct evidence" that was "more probative than any other evidence."

Videotape of Gardinier's January 3, 2002, Interview

The videotape of Gardinier's January 3, 2002, interview with civilian police and Army CID is over four hours in duration and includes the administration of a "computer voice stress test," which was explained to Gardinier as the next generation

polygraph which does not create false positives.  The video reflects that during the computer voice stress test Gardinier was asked:  (1) "Have you ever touched [KG]'s vaginal area for sexual gratification?" and (2) "Have you ever had or asked KG to touch your penis?"  The detective explained that he was not talking about "normal parental maintenance" such as bathing, diapering and hygiene, and Gardinier indicated he understood this.

Gardinier responded "No" to both of those questions.  When the test was completed, the detective showed Gardinier that the computer voice stress test printout indicated he was not being truthful in response to the two substantive questions.  Gardinier continued to say he had "never done that" and such activities are "not what I do."  After about thirty minutes of additional questioning, Gardinier began making incriminating statements.

On the tape Gardinier stated that perhaps he made a mistake, but that did not make him a bad person.  He acknowledged having sexual thoughts when KG touched his penis, but argued he was merely excited for his wife to return home.  He also acknowledged that he touched her vagina while both of them were naked in the shower.  He stated his penis became erect and he was sexually aroused while touching her.  Additionally, Gardinier told the detective that KG touched his penis for about

five seconds and it grew a little bit after she touched it. Further describing this incident, Gardinier stated that after KG touched his penis he stroked his penis one or two times and some fluid came out. He also admitted that KG had touched his penis two to three times on other occasions. When he admitted the videotape, the military judge stated he had viewed the taped interview more than once.

In reviewing the tape the military judge saw Gardinier "fail" the computer voice stress test in regard to two pivotal questions concerning his conduct towards KG. He also saw the detective explain on the video how he knew from the test that Gardinier was not telling the truth. Military Rule of Evidence (M.R.E.) 707 prohibits the results of a polygraph examination and the opinion of a polygraph examiner from being admitted into evidence. Polygraph evidence is prohibited because the "reliability of polygraph evidence has not been sufficiently established and its use at trial impinges upon the integrity of the judicial system." Manual for Courts-Martial, United States, Analysis of the Military Rules of Evidence app. 22 at A22-51 (2008 ed.) (citing People v. Kegler, 242 Cal. Rptr. 897 (Cal. Ct. App. 1987)).[2]

---

[2] The admission of the polygraph evidence was not objected to at trial nor argued by the parties on appeal. We do not base our decision on the apparent violation of M.R.E. 707, but we do take notice of the content of the videotape viewed by the military judge in applying the Chapman test.

KG's Hearsay Statements to the Sexual Assault Nurse and Gardinier's January 3, 2002, Statement

In addition to the videotapes of the Gardinier and KG interviews, the military judge erroneously admitted KG's statements to the sexual assault nurse and Gardinier's January 3, 2002, statement.  The sexual assault nurse was permitted to testify that KG told her she touched "Daddy's cooter" and "sometimes she saw Daddy's cooter get bigger," which was consistent with KG's statement in the videotaped interview.  Gardinier's January 3, 2002, written statement closely paralleled many of the oral statements he made during the videotaped interview after he had been administered the computer voice stress test.  At trial the Government placed great emphasis on this statement because it was "in his own writing, in his own words, without others coaching him and without others putting any words in his mouth.  He sits there alone in the room and writes these statements out."

## Analysis

The impact of the admission and consideration of the two videotapes is problematic for the Government in its efforts to establish that there is no reasonable possibility that the evidence complained of might have contributed to the conviction.  The military judge viewed both videotapes more than once.  There can be little doubt that he placed a great deal of importance on KG's interview as he stated that her recorded statements were

"more probative than any other evidence" and that "the videotape allows the finder of fact to actually view directly [KG]'s demeanor and her statements unfiltered by any other person's perceptions or memory."

While the military judge did not make specific findings as to the weight he attributed to the Gardinier videotape, his statements about the KG videotape illustrate the importance that he, as the factfinder, placed on seeing the demeanor and hearing the statements of key witnesses. Not only did the military judge observe Gardinier's demeanor during the videotaped interview, he witnessed the entire computer voice stress test where the detective informed Gardinier that the test reflected that he was untruthful.

We have already discussed the importance of the erroneously admitted evidence to the Government's case and the importance that the military judge placed on that evidence. The centrality of the videotapes to the Government's case and probative value given to them by the factfinder weighs heavily against the Government.

As to whether the evidence was cumulative, important portions of KG's videotaped interview were not cumulative of untainted evidence. While several hearsay statements made by KG were admitted into evidence, as the military judge noted, those statements were filtered by the perceptions and memory of the

persons who heard them.[3]  Her videotaped interview was the only opportunity for the factfinder to see and hear her give an accounting of the incidents.

Nor was Gardinier's January 3 statement entirely cumulative of the more formal January 7 statement which was admitted into evidence.  The Government urged greater emphasis on the January 3 statement because it was handwritten, in his own words and without coaching from the police.  While the two statements contained many similarities pertaining to the offenses of which Gardinier was convicted, the January 3 statement contained admissions from Gardinier not found in the January 7 statement.  In the January 3 statement, Gardinier states that he admonished KG and sent her out of the room after his "hand went to [his] penis which ejaculated a little which she noticed."  However, in the January 7 statement, Gardinier indicates that he had already

---

[3] This hearsay testimony was admitted through three witnesses. Douglas H. Lehman, a social worker who provided six hours of treatment for KG, testified that KG only made one statement pertaining to sexual abuse, i.e., that Gardinier made her touch his "cooter."  Saundra M. Freeman was a friend of the family who stayed with the family after the allegations arose.  She testified that KG drew pictures that KG said were "her daddy's pee-pee," "her daddy laying on the bed naked" and "her mom wearing underwear."  Tracy Gardinier, Gardinier's wife and KG's mother, testified that she asked KG if anyone ever touched her private parts and KG responded "Daddy does."  Tracy further testified that KG said Gardinier touched her every time Tracy left the house.  These hearsay statements do not provide the detail or specificity present in the erroneously admitted evidence.

sent KG away when he saw that his penis "had gotten aroused and a drop of fluid was at the end of it" and he "touched it."  In the January 3 statement, Gardinier also stated that the incident where KG touched his penis, which was the basis for the indecent liberties offense, lasted about "five minutes."  In contrast, in the January 7 statement, he changed his accounting and told the CID agent the incident lasted "approximately one minute." Finally, with regard to the indecent acts conviction where Gardinier touched KG's vagina while they were in the shower together, in the January 3 statement, Gardinier stated he got "unintentionally aroused," whereas in the January 7 statement, Gardinier clarified that he was only "somewhat aroused" and it "had nothing to with her."  His January 3 statement did not address whether the arousal resulted from touching KG.

Similarly, in addition to the military judge being able to observe the computer stress test and having the opportunity to hear Gardinier and observe his demeanor, the videotape of Gardinier's January 3 interview contains evidence that is not contained in the January 7 statement.  For instance, in the videotape, Gardinier described how, after KG touched his penis, he stroked his penis and some fluid came out, whereas in the January 7 written statement he only admitted touching his penis, which already had a drop of fluid on it.  His statement on the videotape describes more contact than either of the written

statements.  In the videotape, Gardinier also discussed that he made a "mistake" -- an acknowledgement not present in the January 7 statement.

As to whether the evidence was corroborated or contradicted by admissible evidence, Gardinier's January 7, 2002, statement was the principal piece of evidence remaining against him and was corroborated by summary hearsay statements made on different occasions by the alleged victim.  Supra note 3.  However, Gardinier's January 7 statement contained no clear admission that he took indecent liberties with KG or engaged in indecent acts with her as charged.  He admitted being caught partially naked by KG and that she, on her own accord, unexpectedly touched his penis.  He also admitted that he twice took showers with her and washed her private parts.  Although he admitted becoming sexually aroused during both these incidents, he unequivocally denied any deliberate sexual activity with or thoughts about his daughter.  As discussed above, the January 3 statement and videotape contained more serious admissions from Gardinier, in contrast to the properly admitted January 7 statement.  KG's videotaped statements also provided inculpatory evidence of material facts for both specifications that contradicted the properly admitted Gardinier statement in important ways and strengthened the Government case.

14

United States v. Gardinier, No. 06-0591/AR

KG did not testify, so the defense had no opportunity to cross-examine her. As a result, KG's videotaped interview and her hearsay statements admitted through the sexual assault nurse were not tested by the crucible of cross-examination.

Finally, without the videotapes of KG and Gardinier, without Gardiner's January 3 handwritten statement and without the sexual assault nurse's hearsay testimony, the overall strength of the Government's case is not "'overwhelming.'" See United States v. Moran, 65 M.J. 178, 188 (C.A.A.F. 2007) (quoting United States v. Ross, 7 M.J. 174, 178 (C.M.A. 1979)) (holding a constitutional error harmless because the government's untainted evidence was overwhelming).

In analyzing all of the erroneously admitted evidence and the remaining evidence of record under the Van Arsdall factors, we find that there is a reasonable possibility that the erroneously admitted evidence might have contributed to the conviction. See Chapman, 386 U.S. at 23. We cannot find that videotapes containing allegations of sexual abuse by a five-year-old victim against her father, which the military judge as factfinder called "more probative than any other evidence," and the father's subsequent incriminating statements, when balanced with the remaining evidence of record, were "'unimportant'" to the finder of fact. See Othuru, 65 M.J. at 377 (citation omitted).

## Decision

The decision of the United States Army Court of Criminal Appeals is reversed.  The findings of guilty and the sentence are set aside.  The record is returned to the Judge Advocate General of the Army and a rehearing is authorized.