# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
MULLIGAN, BURTON, and BORGERDING[1]
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Specialist LEVI A. KEEFAUVER**
**United States Army, Appellant**

ARMY 20121026

Headquarters, 101st Airborne Division (Air Assault) and Fort Campbell (convened)
Headquarters, Fort Campbell (action)
Timothy Grammel, Military Judge (arraignment and motion hearing)
Steven E. Walburn, Military Judge (trial)
Lieutenant Colonel Jeff A. Bovarnick, Staff Judge Advocate

For Appellant:  Colonel Kevin Boyle, JA; Lieutenant Colonel Jonathan A. Potter, JA; Major Amy E. Nieman, JA; Captain Patrick J. Scudieri, JA (on brief); Colonel Kevin Boyle, JA; Lieutenant Colonel Jonathan F. Potter, JA; Captain Patrick J. Scudieri, JA (on reply brief).

For Appellee: Colonel Mark H. Sydenham, JA; Major A.G. Courie III, JA; Major Steven J. Collins, JA; Captain Anne C. Hsieh, JA (on brief).

25 November 2015

---------------------------------------------------------------
MEMORANDUM OPINION ON FURTHER REVIEW
---------------------------------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

BORGERDING, Judge:

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of two specifications of violating a lawful general regulation by wrongfully possessing drug paraphernalia and unregistered weapons on-post, one specification of wrongful possession of marijuana with intent to distribute, and one specification of child endangerment, in violation of Articles 92, 112a, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892, 912a, 934 (2006) [hereinafter UCMJ].  The military judge sentenced appellant to a bad-conduct discharge,

---

[1] Judge BORGERDING took final action in this case while on active duty.

confinement for four years, forfeiture of all pay and allowances, and reduction to the grade of E-1.  The convening authority approved the adjudged sentence.

On 29 July 2014, this court issued an opinion of the court in appellant's case, affirming the findings of guilty and the sentence as approved by the convening authority.  *United States v. Keefauver,* 73 M.J. 846 (Army Ct. Crim. App. 2014).  On 12 June 2015, our superior court reversed that decision, finding error in our upholding of a "protective sweep" conducted in this case.  *United States v. Keefauver,* 74 M.J. 230, 237 (C.A.A.F. 2015).  Our superior court then returned the record of trial to The Judge Advocate General of the Army for remand to this court for further action consistent with their resolution of the granted issue.  *Id*.

## FACTS

On 8 December 2011, Kentucky postal inspectors intercepted a suspicious box that smelled of marijuana and was addressed to a residential address on Fort Campbell, Kentucky belonging to appellant.  Upon further inspection of the box, inspectors observed that it was a heavily taped, approximately eight-pound "Ready-Post" priority box, with delivery confirmation and insurance stickers.  The return address was a hand-written label showing a "B. Samuelson" mailed it from an address in northern California.  While there was no record of a "B. Samuelson" at that return address, investigators did learn that appellant and his wife had claimed that address as their own in years past. These facts, coupled with the odor of marijuana emanating from the box, indicated to the postal inspectors that the box was being used for drug trafficking.

Since the box was addressed to a house located on Fort Campbell, the postal inspectors contacted the Drug Suppression Team Chief at the Fort Campbell Criminal Investigation Command (CID) office, Special Agent (SA) SR, in hopes of conducting a "controlled delivery."[2]

Special Agent SR then obtained a verbal authorization from the military magistrate, Captain (CPT) MR, to conduct a controlled delivery of the package and to conduct a search limited to the box itself.

Special Agent SR and his team conducted surveillance in the front and the rear of appellant's house and watched as a member of the postal inspection team delivered the box.  When no one answered the door, the agent put the box on the front doorstep and the team waited outside for approximately an hour until an

---

[2] The postal inspector testified that a "controlled delivery" is a delivery controlled by law enforcement personnel whereby they mimic what a regular letter carrier would normally do every day in the event that the individuals expecting the package are conducting surveillance and tracking the package.

individual later identified as appellant's sixteen-year-old stepson, TC-D, arrived home and took the box inside.

Once the package was inside the house, the surveillance team moved in and entered the home to retrieve the box. Special Agent SR immediately located the package right inside the home in the hallway, about ten feet from the front door.

Once the package was located, SA SR conducted a "security sweep" of the home to "ensure that no one else [other than TC-D] was inside the house" and that no one was "destroying evidence."

Special Agent SR began this sweep in the downstairs area where he saw a "marijuana-type smoking device" on the kitchen counter. He then continued upstairs where he observed a bag of what appeared to be marijuana laying in plain view on the bed in TC-D's room as well as at least two items of drug paraphernalia, also in plain view, in the room. He also saw "a couple rifles" in an unlocked walk-in closet in the hallway. In the master bedroom, also in plain view, he saw more boxes with similar characteristics to the one that had just been delivered, all of which bore similar indicia of drug trafficking.

After the protective sweep was completed and the home was cleared, law enforcement brought in a military working dog (MWD) which conducted a search and alerted on multiple areas within the house. Upon entry into the house, several of the law enforcement agents noted there was a very strong smell of marijuana emanating from the house in general and not just from the box.

The MWD alerted as soon as it entered TC-D's room. In addition to the items seen in plain view by SA SR, investigators found more marijuana throughout the room, both loose and in small Ziploc bags. Next, although SA SR did not recall seeing any items in plain view in the room later determined to belong to appellant's thirteen-year-old biological son, EK, the MWD alerted on a container found in plain view on the floor in the middle of the room. In addition, the MWD alerted on a dresser drawer where investigators found more marijuana, rolling papers, and a pipe.

In the master bedroom, the MWD alerted to additional bags of marijuana located in a dresser. The investigators also found a vaporizer which appeared to be used to smoke marijuana, a scale which could be used to weigh drugs, and a large sum of money in a dresser drawer.

In the downstairs area of the home, the MWD alerted on a black duffel bag found inside a closet under the stairs. It contained no marijuana but did contain $4,000 in cash. Investigators also found an amount of cash inside a teapot in the dining room. In a closet immediately inside the residence, investigators found two

3

handguns stored in a locked container and a bag of marijuana inside a bin of toy cars. Finally, investigators searched garbage cans outside the house and found plastic bags similar to ones found inside the house that had $1,000, $2,000, $8,000, and $8,300 written on them. All items, including those SA SR saw in plain view during his protective sweep, were seized and admitted into evidence at trial.

Following their search, investigators opened the box originally delivered to the home while it was still inside the residence. The box contained approximately three to four pounds of "high grade" marijuana packaged in a manner consistent with drug trafficking.

Later, at the CID office, investigators searched both appellant and EK "for officer safety in accordance with . . . standard operating procedures." During these searches, they found $900 in cash consisting of nine $100 bills in appellant's pockets and $692 in EK's pockets. After seeing his sons at the CID office, appellant told the investigators "all the stuff you found in the house is mine, I don't want my family getting in trouble," or words to that effect.

## LAW AND DISCUSSION

### *Inevitable Discovery*

In light of our superior court's decision that SA SR's protective sweep of the home was not warranted, we must first determine if there is any other basis upon which the bulk of the evidence against appellant (besides the delivered box) can be considered. We find that there is not. Specifically, the doctrine of inevitable discovery is now inapplicable to the facts of this case.

The doctrine of inevitable discovery is an exception to the exclusionary rule allowing for the admission of evidence that, although obtained improperly, would have been properly obtained by other means. *United States v. Wallace*, 66 M.J. 5, 10 (C.A.A.F. 2008) (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)); *see also* Military Rule of Evidence [hereinafter Mil. R. Evid.] 311(b)(2) ("Evidence that was obtained as a result of an unlawful search or seizure may be used when the evidence would have been obtained even if such unlawful search or seizure had not been made.").

For the inevitable discovery exception to apply, the government had to demonstrate by a preponderance of the evidence that "when the illegality occurred, the government agents possessed, or were actively pursuing, evidence or leads that would have inevitably led to the discovery of the evidence . . . in a lawful manner . . . ." *United States v. Dease*, 71 M.J. 116, 122 (C.A.A.F. 2012) (quoting *United States v. Kozak*, 12 M.J. 389, 394 (C.M.A. 1982)); *see also United States v. Wicks,* 73 M.J. 93, 103 (C.A.A.F. 2014).

4

In this case, the "illegality occurred" as soon as SA SR left the area in the immediate vicinity of the box. There is no evidence at this point that the agents possessed, or were pursuing, evidence or leads that would have inevitably led to the discovery of any other items in the home. *Wicks,* 73 M.J. at 103; *see also United States v. Alexander*, 540 F.3d 494, 502 (6th Cir. 2008) ("The inevitable discovery doctrine 'requires [a] court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred.'") (quoting *United States v. Kennedy*, 61 F.3d 494, 498 (6th Cir. 1995)). At this particular point in time, investigators had no further evidence to support a finding of probable cause to search than when they originally made the search request.[3] Thus, given that the investigators had, at this point, found only what they expected to find—the box—and nothing more, we cannot even say that "the routine procedures of a law enforcement agency would inevitably find the same evidence." *United States v. Owens*, 51 M.J. 204, 210 (C.A.A.F. 1999). In short, the inevitable discovery doctrine cannot rescue any evidence found in the house beyond the box, and the admission of such evidence violated appellant's Fourth Amendment rights.

We review constitutional errors under the harmless beyond a reasonable doubt standard found in *Chapman v. California,* 386 U.S. 18, 24 (1967). *See United States v. Mott,* 72 M.J. 319, 332 (C.A.A.F. 2013); *United States v. Paige,* 67 M.J. 442, 449 (C.A.A.F. 2009); *see also United States v. Simmons*, 59 M.J. 485, 489 (C.A.A.F. 2004). "Whether a constitutional error in admitting evidence is harmless beyond a reasonable doubt is a question of law that we review *de novo.*" *United States v. Crudup,* 67 M.J. 92, 94 (C.A.A.F. 2008); *see also United States v. Gardinier,* 67 M.J. 304, 306 (C.A.A.F. 2009)).

"In assessing harmlessness in the constitutional context, the question is not whether the evidence is legally sufficient to uphold [appellant's] conviction without the erroneously admitted evidence. Rather, the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Gardinier,* 67 M.J. at 306 (quoting *Chapman*, 386 U.S. at 23) (internal citations and quotation marks omitted). Further, as our superior court noted in *United States v. Moran*,

---

[3] Even if the mere smell of the marijuana then constituted probable cause, the inevitable discovery doctrine "cannot rescue evidence obtained via an unlawful search simply because probable cause existed to obtain a warrant when the government presents *no* evidence that the police would have obtained a warrant." *Wicks*, 73 M.J. at 103 (citations and internal quotation marks omitted).

> "To say that an error did not 'contribute' to the ensuing
> verdict is not, of course, to say that the jury was totally
> unaware of that feature of the trial later held to have been
> erroneous.  It is, rather, "to find that error unimportant in
> relation to everything else the jury considered on the issue
> in question, as revealed in the record."

65 M.J. 178, 187 (C.A.A.F. 2007) (quoting *Yates v. Evatt*, 500 U.S. 391, 403 (1991), *overruled on other grounds by Estelle v. McGuire*, 502 U.S. 62, 72 n.4 (1991)).

Thus, our determination of whether or not there is a "reasonable possibility" that the evidence admitted erroneously in this case "might have contributed to the conviction," *Chapman*, 386 U.S. at 24 (citing *Fahy v. Connecticut,* 375 U.S. 85, 86-87 (1963)), is "made on the basis of the entire record . . . ." *Mott,* 72 M.J. at 332 (quoting *United States v. Sweeney*, 70 M.J. 296, 306 (C.A.A.F. 2011)).

After a review of the entire record, we find there is a reasonable possibility that the erroneously admitted evidence might have contributed to appellant's convictions for all charges and specifications.  With respect to the Specification of Charge II (wrongful possession of unregistered firearms) and the Specification of Additional Charge I (wrongful possession of drug paraphernalia), the only[4] evidence supporting the convictions was found during the illegal search of appellant's home.  Further, although there was some testimony about appellant's 13-year-old son's drug use that was arguably not tainted by the illegal search, the bulk of the evidence supporting the conviction for child endangerment (Specification 1 of Additional Charge II) was discovered in the child's bedroom during the illegal search.

We also find that despite the fact that the box containing the majority of the marijuana appellant was charged with wrongfully possessing was properly admitted into evidence, there is still a "reasonable possibility" that the sheer volume of

---

[4] In his trial testimony, appellant did admit to possessing unregistered firearms in his home.  However, "[u]nder the circumstances of this case, we are not convinced that the defense strategy of having [appellant] testify at trial [in an attempt to explain the vast amount of incriminating evidence found in his home], would have been the same in the absence of the improperly admitted evidence." *Simmons,* 59 M.J. at 489-90 (citing *United States v. Grooters*, 39 M.J. 269, 273 (C.M.A. 1994) (accused may not have been compelled to testify to explain improperly admitted statements); *United States v. Bearchild*, 17 U.S.C.M.A. 598, 602, 38 C.M.R. 396, 400 (1968) (in-court testimony tainted if given to overcome inadmissible confession)).  Thus, "we cannot view [appellant's] trial testimony as an 'independent' basis for concluding that the improperly admitted evidence 'did not contribute to'" any portion of the findings. *Simmons*, 59 M.J. at 490.

evidence illegally admitted "might have contributed to the conviction" for wrongful possession with the intent to distribute. *Chapman*, 386 U.S. at 24 (citing *Fahy v. Connecticut,* 375 U.S. 85, 86-87 (1963). To convict appellant of wrongful possession (with the intent to distribute), the government was required to prove, *inter alia,* that appellant knowingly and intentionally possessed the controlled substance. *See United States v. Wilson*, 7 M.J. 290 (C.M.A. 1979); *Manual for Courts-Martial, United States* (2008 ed.) [hereinafter *MCM*], pt. IV, ¶ 37.b.(6)(a), c.(2). Under the facts of this case, appellant's alleged possession of the marijuana was constructive, requiring the government to prove appellant "was knowingly in a position or had the right to exercise dominion and control over it either directly or through others." *Wilson*, 7 M.J. at 293 (citations and internal quotation marks omitted); *see also MCM*, pt. IV, ¶ 37.c.(2) ("An accused may not be convicted of possession of a controlled substance if the accused did not know that the substance was present under the accused's control."). "[P]ossession may be established by circumstantial as well as by direct evidence." *Wilson*, 7 M.J. at 293 (citation omitted); *see also MCM*, pt. IV, ¶ 37.c.(2).

We recognize that besides the box and its contents, there are additional, untainted pieces of evidence which *may* be sufficient to prove beyond a reasonable doubt appellant had constructive possession of the marijuana. These include: a return address on the box previously connected to appellant; the smell of marijuana in the home from the front door; the large amount of cash found on appellant's person at CID; appellant's admission that "all the stuff you found in the house is mine, I don't want my family getting in trouble;" and the baggies found in the outside garbage cans. However, the sheer mass of inadmissible evidence found in the house eliminates any possibility the error was harmless beyond a reasonable doubt. *See Gardinier*, 67 M.J. at 306; *see also Chapman*, 386 U.S. at 23. Without the illegally obtained items, the defense claim that the drugs belonged to appellant's wife and that appellant had no idea they were delivered to his house may have succeeded given that the evidence showed only one box delivered at a time when appellant was not home. However, since the military judge also considered the fact that there were multiple, similar boxes found in the home, along with a significant amount of cash and unregistered weapons, it is impossible for us to conclude this knowledge had no effect on his finding of guilt.

The importance of all of the evidence found in the home was underscored by trial counsel in his closing argument. For example, he began: "what does 5.25 pounds of marijuana, over $7,600 in cash, four unregistered firearms, numerous baggies, and a scale equal? We have a criminal enterprise." Of the five things he mentioned, only one was properly in evidence.[5] Moreover, trial counsel's focus on

---

[5] The actual amount of marijuana in the box was closer to 3-4 pounds, according to the postal inspector. The rest of the 5.25 pounds purportedly included the amount of marijuana found throughout the home, an amount now improperly considered.

the evidence now determined to be illegally admitted supported not only the "criminal enterprise," but also appellant's knowledge of the drugs in the house, and the child endangerment specification. In short, the illegally admitted evidence formed the "cornerstone" of the government's case against appellant. *See United States v. Long*, 64 M.J. 57, 66 (C.A.A.F. 2006).

For these reasons, at this stage in the proceedings, it is impossible to separate the impact of all these items on the ultimate conviction. Accordingly, we cannot conclude that the error was harmless beyond a reasonable doubt.

## CONCLUSION

The findings of guilty and the sentence are set aside. A rehearing may be ordered by the same or a different convening authority. *See generally* R.C.M. 810.

Senior Judge MULLIGAN and Judge BURTON concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court